IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| DAVID SZAFRAJDA, | ) | 4:10CV3112 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MEMORANDUM |
| v. | ) | AND ORDER |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

This is an action brought under 42 U.S.C. § 1383(c)(3) to review a final decision of Defendant, Commissioner of Social Security, in which it was determined (1) that Plaintiff's disability ceased on September 1, 2005, and (2) that his eligibility for the payment of supplemental security income benefits under Title XVI of the Social Security Act terminated on November 30, 2005 (the end of the second month after the month of cessation). Plaintiff challenges both aspects of the Commissioner's decision, arguing that the administrative law judge ("ALJ") erred (1) in finding that Plaintiff no longer met the requirements for mental retardation found in Listing 12.05C, 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C, and (2) in failing to consider all of Plaintiff's current impairments and medical evidence through the date of the administrative hearing, as allegedly required by 20 C.F.R. §416.994.

The Commissioner concedes that the ALJ did not fully consider Plaintiff's impairments after September 1, 2005, and has filed a motion to remand the action pursuant to sentence four of 42 U.S.C. § 405(g). Plaintiff opposes the motion and argues that I should either rule on the first issue, and reverse the Commissioner's decision for the reasons stated in Plaintiff's brief, or else direct the Commissioner on remand also to reconsider whether Plaintiff continued to meet Listing 12.05C. In reply, the Commissioner has briefed the first issue and requests that I affirm the determination that Plaintiff did not meet Listing 12.05C as of September 1, 2005.

## *I. Background*

Plaintiff began receiving supplemental security income ("SSI") benefits in 1990, when he was nine years old. (Tr. 58). He was found to be disabled because of mild mental retardation under (former) Listing 112.05B, which required a "valid verbal, performance, or full scale IQ of 59 or less." *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 112.05C. When Plaintiff turned eighteen, his claim was redetermined and he was found to meet Listing 12.05C, which applies to adults. (Tr. 130) This listing requires a "valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C. Plaintiff was found to have "IQ scores in the 60's and additional impairments of ODD [oppositional defiant disorder] and conduct disorder." (Tr. 130)

On September 8, 2005, the agency notified Plaintiff that he was no longer disabled, and would not receive SSI benefits after November 2005. (Tr. 285–86) A hearing was held before a disability hearing officer on February 28, 2007. (Tr. 312) In a decision issued on March 27, 2007, the disability hearing officer found there was medical improvement because Plaintiff no longer carried a diagnosis of oppositional defiant disorder. (Tr. 309-316) Plaintiff appealed this decision to an ALJ, who conducted a hearing on October 22, 2007, and issued an unfavorable decision on March 12, 2008. (Tr. 13–21) Plaintiff's request for a review of the ALJ's decision by the Appeals Council was denied on April 7, 2010. (Tr. 4-7)

This action was commenced on June 10, 2010. (Filing 1) The Commissioner answered Plaintiff's complaint and filed a copy of the administrative record on November 24, 2010. (Filings 13, 14 (text only entry)) Plaintiff's brief on the merits of his appeal was filed on December 31, 2010. (Filing 16)

The Commissioner's motion to remand was filed on April 1, 2011. (Filing 21) In a brief submitted in support of the motion to remand, the Commissioner stated:

-2-

Agency counsel requested that the Appeals Council reconsider SSA's position in this case. Upon review, the Appeals Council agreed that a remand for further consideration was appropriate for the reason discussed below. Defendant requests a remand under sentence four of 42 U.S.C. § 405(g).

Remand is necessary because the ALJ did not fully consider Plaintiff's limitations for the period after September 1, 2005. After determining that Plaintiff's disability ceased on that date, the ALJ should have considered whether Plaintiff again became entitled to benefits at a later time (Tr. 21).

Under the Commissioner's policies, the ALJ first had to consider Plaintiff's condition on September 1, 2005, the date given in the agency's initial determination of disability cessation (Tr. 262). *See* Acquiescence Ruling (AR) 92-2[(6)] (describing the scope of review on appeal in a medical cessation disability case), *available at* http://www.ssa.gov/OP_Home/rulings/ar/06/AR92-02-ar-06.html.[1]

_____

[1] "In *Difford v. Secretary of Health & Human Services*, 910 F.2d 1316, 1319-20 (6th Cir.1990), the Sixth Circuit held that the ALJ should adjudicate the claimant's disabilities through the time of its hearing, such that if the claimant were found to be disabled at the time of the hearing–even if he was not disabled as of the cessation date–his benefits should not be terminated. In response to *Difford*, the SSA issued an 'Acquiescence Ruling' to explain that the agency would comply with the decision only in the Sixth Circuit because it conflicted with the agency's own interpretation of the Social Security Act ('Act'). *See* Social Security Acquiescence Ruling 92-2(6), 57 Fed. Reg. 9262 (Mar. 17, 1992). In Acquiescence Ruling 92-2(6), the SSA stated that its existing policy was to review termination cases on the basis of the claimant's condition only as of the cessation date, not the condition at the time of the ALJ hearing, but that it would alter its policy in the Sixth Circuit. *See id.* at 9264." *McNabb v. Barnhart*, 340 F.3d 943, 944 (9th Cir. 2003). However, all of the evidence available at the time of the ALJ's hearing is to be considered when evaluating the claimant's condition as of the cessation date. *See id.*; 42 U.S.C. § 1382c(a)(4) ("Any determination under this paragraph [regarding termination of SSI benefits] shall be made on the basis of all the evidence available in the individual's case file, including new evidence concerning the individual's prior or current condition which is presented by the individual or secured by the Commissioner of Social Security.").

When considering an appeal of a cessation determination, the agency considers "what the claimant's condition was at the time of the cessation determination, not the claimant's condition at the time of the disability hearing/reconsideration determination, ALJ decision[,] or Appeals Council decision." *Id.* Defendant maintains that the ALJ correctly considered Plaintiff's condition at the time of the initial cessation determination.

However, a claimant whose benefits ceased will become reentitled to benefits without filing a new application if he "again meet[s] the requirements for eligibility before [his] appeal rights are exhausted." *See* 20 C.F.R. § 416.305(b)(5) (2010). In view of Dr. Perry's hearing testimony (Tr. 480–93), the ALJ should have considered whether Plaintiff again became eligible for benefits. The agency seeks remand so that it can properly consider this issue.

Upon receipt of the Court's remand order, the Appeals Council will remand the case to the ALJ with instructions to update the record and to hold another hearing. In a new decision, the ALJ will further evaluate Plaintiff's impairments for the period after September 1, 2005 pursuant to 20 C.F.R. sections 416.994 and 416.305. If applicable, the ALJ will also consider whether substance abuse is material to the issue of disability. *See* 20 C.F.R. § 416.935 (2010).

For the foregoing reasons, and pursuant to the Supreme Court's decision in *Shalala v. Schaefer*, 509 U.S. 292 (1993), Defendant requests the Court to enter a final judgment pursuant to Rule 58 of the Federal Rules of Civil Procedure reversing the ALJ's decision and remanding this case to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g). Entry of final judgment remanding this case will begin the appeal period which determines the thirty-day period during which a timely application for attorney fees under the Equal Access to Justice Act, 28 U.S.C. § 2412, may be filed.

(Filing 22)

-4-

Karyn B. Perry, Ph.D., testified that Plaintiff has a severe mental impairment and currently meets Listings 12.02 (organic mental disorder) and 12.09 (substance addiction disorder); she also testified that alcohol and marijuana use are material to the case.  (Tr. 483) Dr. Perry opined that Plaintiff has moderate limitations in activities of daily living and in social functioning, and marked limitations in concentration, persistence, or pace. (Tr. 488) The ALJ dismissed the testimony of this medical expert, stating:

> Furthermore, Dr. Perry's testimony that the Claimant satisfies the medical requirements set forth under Sections 12.09 and 12.02 of the listings was based on evidence of significant substance abuse discussed by Matthew Hunt, Ph.D., in June 2006 (Exhibit 36) and further documented by Thomas England, Ph.D., in May 2007 (Exhibit 46). However, both of those examinations took place long after September 2005, the date that the Social Security Administration determined that the Claimant's disability ceased.  When seen by Dr. Stone in August 2005, the Claimant specifically stated that he "does not drink now" having "quit two years ago."  He also denied any current drug use. Evidence that Mr. Szafrajda resumed drinking and abusing street drugs after [sic] many months after September 2005 is simply not relevant to this inquiry.

(Tr. 17)

After carefully reviewing the record and the parties' briefs, I find and conclude that the ALJ's decision must be reversed and the case remanded for redetermination of Plaintiff's entitlement to continued benefits under 20 C.F.R. § 416.994 from and after September 1, 2005, because the ALJ failed to make a proper evaluation.  The limited remand requested by the Commissioner will not suffice because the ALJ's determination that Plaintiff's disability ceased on September 1, 2005, is contrary to law and not supported by substantial evidence.

-5-

## II. Discussion

The basic standard of review in Social Security cases is whether there is substantial evidence on the record as a whole to support the decision of the Commissioner. *See Hogan v. Apfel, 239 F.3d 958, 960 (8th Cir. 2001)*. "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." *Id.* (quoting *Prosch v. Apfel, 201 F.3d 1010,1012 (8th Cir. 2000)*). Evidence that both supports and detracts from the Commissioner's decision must be considered, but the decision may not be reversed merely because substantial evidence supports a contrary outcome. *See Moad v. Massanari, 260 F.3d 887, 890 (8th Cir. 2001)*.

The decision of the Commissioner must also be reviewed to decide whether the proper legal standard was applied in reaching the result. *See Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir.1992)*. Issues of law are reviewed de novo. *See Boock v. Shalala, 48 F .3d 348, 351, n.2 (8th Cir. 1995)*.

### A. Statement of Facts

An application for supplemental security income was filed for Plaintiff on March 8, 1990, alleging disability based on mental retardation. (Tr. 49) Dr. Melvin Canell, Ed.D., performed a consultative evaluation for the Disability Determination Section and filed his psychiatric report, dated April 12, 1990. (Tr. 112) Dr. Canell administered a WAIS[2] for Children Revised test to Plaintiff which revealed that Plaintiff had a verbal IQ of 58, a performance IQ of 70, and a full scale IQ of 61. (Tr. 113) Dr. Canell gave a diagnosis of mild mental retardation. (Tr. 114) Grand Island Public School records reflect a January 1994 assessment which showed WISC-III[3]

---

[2] Wechsler Adult Intelligence Scale.

[3] Wechsler Intelligence Scale for Children.

scores of verbal-72; performance-77; and full scale-72. (Tr. 239) The school records also show that Plaintiff's scores on a WISC-R test administered in 1991 were verbal-68; performance-75; and full scale-70. (Tr. 235)

Plaintiff's case was reviewed in 2000, when Plaintiff turned 18, and Caroline G. Sedlacek, Ph.D., performed a psychological interview. (Tr. 253) Dr. Sedlacek also administered a WAIS-III test to Plaintiff, which showed he had a verbal IQ score of 67; a performance IQ score of 69; and a full scale IQ score of 65. (Tr. 257) Dr. Sedlacek wrote: "These results are valid in assessing his current level of functioning." (Tr. 257) Dr. Sedlacek gave diagnoses of oppositional defiant disorder (ODD) and rule out intermittent explosive disorder. (Tr. 258)

Plaintiff's case was reviewed again in 2005, and Plaintiff was examined by William R. Stone. Jr., Ph.D., who filed a report dated August 10, 2005. (Tr. 361 Plaintiff told Dr. Stone that he had worked at a fast-food restaurant for about eighteen months, but quit because "he was on social security and 'couldn't have that many hours'" (Tr. 362). Plaintiff also revealed that he had worked at another fast-food restaurant, but "quit working to go and stay with his sister to help her out" with her children (Tr. 362). He informed Dr. Stone that he washed dishes, mowed the lawn, helped to cook at times, watched television, and read books about the Vietnam War that he obtained from the library (Tr. 362). Plaintiff stated he liked to "hang out" at the mall, attended church with his girlfriend, and had friends "back home" in his hometown (Tr. 363).

Dr. Stone observed that Plaintiff currently functioned in the "mildly retarded" range in terms of vocabulary and intellectual functioning, but had intact memory, and spoke in a relevant and coherent manner (Tr. 363). Dr. Stone concluded that Plaintiff could sustain concentration and attention; understand, remember, and carry out short and simple instructions; interact appropriately with co-workers and supervisors; and "adapt[] to ordinary day to day changes in his environment with the presence of someone to assist him when matters become too complicated" (Tr. 364). No IQ tests

were administered. Dr. Stone's diagnoses were mild mental retardation; alcohol abuse, inactive; and a history of a single depressive episode, NOS. (Tr. 364)

Matthew Hutt, Ph.D., completed a psychological report, dated June 6, 2006. (Tr. 387) He noted: "The claimant speaks with a mild impediment and his overall speech and language reflects a simplistic, intellectually limited capacity." (Tr. 387) Dr. Hutt also noted that the claimant walked to today's interview from his apartment as he has no driver's license and never has, quoting the claimant, "I can't get past the written test." (Tr. 387) Dr. Hutt also noted: "Mental acuity was rather poorly intact. He was administered the mental control portion of the Wechsler Memory Scale and he produced a raw score equal to 8 which translates into an age-adjusted scaled score equal to 4. This gentleman likely has rather lowered levels of concentration and attention." (Tr. 389)

Board certified psychiatrist, R.A. de los Angeles, M.D., saw Plaintiff on March 8, 2007. (Tr. 419) He gave diagnoses of bipolar disorder; drug induced psychosis; and antisocial personality disorder. Plaintiff's Global Assessment of Functioning (GAF) score was 30/30. (Tr.420) Dr. de los Angeles, added the following note:

> David is not able to work due to his extensive drug abuse. Has problems with psychotic thinking & impulsive mood swings & the street drugs 'messed' up (destroyed) his neuro transmitters helpful to regain cognitive functioning esp. memory/recall, attention, concentration & comprehension over life circumstances ??? - Pt. not able to work but needs to be in mental health rehabilitation - V2 house assisted living; IOP [intensive out patient]. He will cont. to be a nuisance to society if treatment is not rendered & followed by the pat.

(Tr.420)

Licensed clinical psychologist, Thomas H. England, Ph.D., completed a psychological evaluation, dated May 15, 2007. (Tr. 422) Dr. England's behavior observations included the following: "Mr. Szafrajda appeared for each session with

-8-

marginal hygiene and dress .... Memory functions were erratic, with some remote details adequate (e.g.: substance use and legal issues), with others more limited (e.g.: his psychiatric medications) .... Insight is limited, Judgment frequently impulsive and intellectual functioning appears low average to borderline." (Tr. 423) Dr. England administered a WAIS test, which showed Plaintiff has a verbal IQ score of 75, a performance IQ of 70, and a full scale IQ score of 72. (Tr. 423) Dr. England also administered the Shipley Institute of Living Scale (Tr. 422) Dr. England noted: "This pattern of scores is similar to those who have experienced a loss of cognitive abilities due to some trauma or insult to brain processes. While his loss of functioning is not sufficient to be diagnostic of impairment, it does suggest he may have some loss of abstract thinking attributable to organic brain dysfunction." (Tr. 423)

Dr. England also noted: "His responses to the WRAT[4] earned scores reflecting an approximate fourth grade skill level in reading, spelling and arithmetic. The standard score equivalent of these levels is 69, 70 and 65 respectively. In tested areas of academic achievement, David functions in a range of two or more standard deviations below the mean." (Tr. 424) Dr. England gave a tentative diagnostic impression of mood disorder, NOS; rule out bipolar disorder, NOS; rule out substance induced mood disorder; rule out (adult) attention deficit hyperactivity disorder; cannabis abuse, in partial or recent remission by report; methamphetamine dependence in reported remission; alcohol abuse; personality disorder, NOS; cluster B traits; and borderline intellectual functioning with marked limitations in language and arithmetic skills.  Plaintiff's GAF score was 50/50. (Tr. 424)

## B.  Administrative Review

Under the Commissioner's policies, a claimant's "continued entitlement to . . . benefits must be reviewed periodically." 20 C.F.R. § 416.994(a). The agency must

---

[4]Wide Range Achievement Test.

"follow specific steps in reviewing the question of whether . . . disability continues." 20 C.F.R. § 416.994(f). Those steps are listed in 20 C.F.R. § 416.994(b)(5):

> (5) Evaluation steps. To assure that disability reviews are carried out in a uniform manner, that a decision of continuing disability can be made in the most expeditious and administratively efficient way, and that any decisions to stop disability benefits are made objectively, neutrally, and are fully documented, we will follow specific steps in reviewing the question of whether your disability continues. Our review may cease and benefits may be continued at any point if we determine there is sufficient evidence to find that you are still unable to engage in substantial gainful activity. The steps are as follows. (See paragraph (b)(8) of this section if you work during your current period of eligibility based on disability or during certain other periods.)
>
> (i) Step 1. Do you have an impairment or combination of impairments which meets or equals the severity of an impairment listed in appendix 1 of subpart P of part 404 of this chapter? If you do, your disability will be found to continue.
>
> (ii) Step 2. If you do not, has there been medical improvement as defined in paragraph (b)(1)(i) of this section?[5] If there has been medical improvement as shown by a decrease in medical severity, see step 3 in paragraph (b)(5)(iii) of this section. If there has been no decrease in medical severity, there has been no medical improvement. (See step 4 in paragraph (b)(5)(iv) of this section.)
>
> (iii) Step 3. If there has been medical improvement, we must determine whether it is related to your ability to do work in accordance with paragraphs (b)(1)(i) through (b)(1)(iv) of this section; i.e., whether or not

---

[5] "Medical improvement is any decrease in the medical severity of your impairment(s) which was present at the time of the most recent favorable medical decision that you were disabled or continued to be disabled. A determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings associated with your impairment(s) (see § 416.928)." 20 C.F.R. § 416.994(b)(1)(i).

-10-

there has been an increase in the residual functional capacity based on the impairment(s) that was present at the time of the most recent favorable medical determination. If medical improvement is not related to your ability to do work, see step 4 in paragraph (b)(5)(iv) of this section. If medical improvement is related to your ability to do work, see step 5 in paragraph (b)(5)(v) of this section.

(iv) Step 4. If we found at step 2 in paragraph (b)(5)(ii) of this section that there has been no medical improvement or if we found at step 3 in paragraph (b)(5)(iii) of this section that the medical improvement is not related to your ability to work, we consider whether any of the exceptions in paragraphs (b)(3) and (b)(4) of this section apply. If none of them apply, your disability will be found to continue. If one of the first group of exceptions to medical improvement applies, see step 5 in paragraph (b)(5)(v) of this section. If an exception from the second group of exceptions to medical improvement applies, your disability will be found to have ended. The second group of exceptions to medical improvement may be considered at any point in this process.

(v) Step 5. If medical improvement is shown to be related to your ability to do work or if one of the first group of exceptions to medical improvement applies, we will determine whether all your current impairments in combination are severe (see § 416.921). This determination will consider all your current impairments and the impact of the combination of these impairments on your ability to function. If the residual functional capacity assessment in step 3 in paragraph (b)(5)(iii) of this section shows significant limitation of your ability to do basic work activities, see step 6 in paragraph (b)(5)(vi) of this section. When the evidence shows that all your current impairments in combination do not significantly limit your physical or mental abilities to do basic work activities, these impairments will not be considered severe in nature. If so, you will no longer be considered to be disabled.

(vi) Step 6. If your impairment(s) is severe, we will assess your current ability to do substantial gainful activity in accordance with § 416.960. That is, we will assess your residual functional capacity based on all your current impairments and consider whether you can still do work

-11-

you have done in the past. If you can do such work, disability will be found to have ended.

(vii) Step 7. If you are not able to do work you have done in the past, we will consider one final step. Given the residual functional capacity assessment and considering your age, education, and past work experience, can you do other work? If you can, disability will be found to have ended. If you cannot, disability will be found to continue.

## C.  The ALJ's Decision

The ALJ determined at step one that "[t]he Claimant's current medically determinable impairment has not revealed the same or equivalent attendant medical findings as are recited in Appendix 1 to Subpart P of the Social Security Regulations No. 4."  (Tr. 16-17) The ALJ explained:

Based on the clinical findings reported by Dr. Stone, the undersigned concludes that the Claimant's intellectual impairment imposes only moderate restrictions in his activities of daily living, moderate limitations in his ability to maintain social functioning, and moderate limitations in his ability to maintain concentration, persistence and pace.  At times pertinent to this inquiry, there have been no episodes of decompensation.

With respect to the CPD [comparison point decision?] determination that the Claimant satisfied the medical requirements set forth in Section 12.05C of the listings, it is noted that, in view of his ability to care for himself, maintain social relationships, his ability to understand and remember short and simple instructions as documented by Dr. Stone, the fact that Mr. Szafrajda has performed unskilled work in the past, the results of WISC-III testing in 1997 (see Exhibit 16/6),[6] and the results of repeat WAIS-III testing conducted in May 2007 (see Exhibit 46), there is reason to suspect that the IQ scores reported by Dr.

---

[6] Although the WISC-III test results appear in a 1997 assessment, a notation indicates that the test was administered in January 1994. (Tr. 239)

Sedlacek in October 2000 were not consistent with the Claimant's developmental history and degree of functional limitation.

In this regard, the undersigned notes that, in *Holland v. Apfel*, 153 F.3d 620 (1998) the Eighth Circuit Court of Appeals stated that, while the Plaintiff's tested IQ fell in the range specified in listing 12.05(C), "other evidence in the record which indicates the individual's ability to function can be used to discredit the IQ score." As such, an IQ test is merely "useful" but in no way controlling according to the Court. Similar language was set out in *Mackey v. Shalala*, 47 F.3d 951 (8th Cir. 1995) when the Court stated that other evidence in the record can be examined to discredit IQ testing indicative of mild mental retardation. Finally, in *Clark v. Apfel*, 141 F.3d 1253 (1998) the Court affirmed the decision of the Administrative Law Judge who had rejected the test scores obtained by a consulting psychologist finding that they were not credible in light of the fact that they were based on a one-time examination by a non-treating psychologist, and that the Plaintiff was literate and had worked in the private sector, had no restriction in his activities of daily living, had exhibited no deficit in social functioning, had demonstrated no significant deficiency in concentration, persistence or pace, and had experienced no deterioration or decompensation in a work setting.

(Tr. 17)

Having found that the Plaintiff's impairments did not meet or equal the severity of a listed impairment, the ALJ was required at step two of the seven-step evaluation process to determine whether there had been "medical improvement." The ALJ made no such determination in this case. Instead, he decided that the IQ scores reported by Dr. Sedlacek in October 2000, which resulted in a finding that Plaintiff met Listing 12.05C, were "suspect." The ALJ then jumped to step six to assess Plaintiff's residual functional capacity ("RFC") as of September 1, 2005 (Tr. 17-20), and, after noting that Plaintiff had no relevant past work activity, moved on to step seven to find that Plaintiff's RFC would allow him to work (Tr. 20). Only after making this ultimate

-13-

finding that Plaintiff was not disabled did the ALJ indicate that Plaintiff's condition had improved.  He stated:

> Notwithstanding the non-exertional limitations resulting from his medically determinable impairment/impairments, the Claimant, as of September 1, 2005, possessed the residual functional capacity for work that exists in the regional economy in significant numbers.  Thus, there has been medical improvement in the Claimant's condition since November 17, 2000, and that improvement has been directly related to his ability to work.

(Tr. 20)

As noted previously, "[a] determination that there has been a decrease in medical severity must be based on changes (improvement) in the symptoms, signs and/or laboratory findings" associated with the claimant's impairments.  20 C.F.R. § 416.994(b)(1)(i).  Medical improvement "is determined by a comparison of prior and current medical evidence . . .." 20 C.F.R § 416.994(b)(2)(i). Merely finding that Plaintiff is now able to work, and suggesting that the earlier disability determination was erroneous,[7] does not support a determination of medical improvement. *See Veino v. Barnhart*, 312 F.3d 578, 587 (2d Cir. 2002) (simple facts that claimant once qualified for a particular impairment in the Listing of Impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1, and that he is now found not to qualify for that Listing, does not prove his medical improvement); *Osborn v. Barnhart*, No. 03-M-2529, 2004 WL 2091480, *1-2  (D.Colo. Aug. 6, 2004) (reversing for legal error where "the ALJ indulged in the presumption that the claimant's failure to meet the listing requirement

---

[7] A recipient of SSI benefits may be determined not to be entitled to such benefits based on "substantial evidence (which may be evidence on the record at the time any prior determination of the entitlement to benefits based on disability was made, or newly obtained evidence which relates to that determination) which demonstrates that a prior determination was in error." 42 U.S.C. § 1382c(a)(4)(C). The ALJ did not make an express finding that the prior determination was in error.

-14-

[for Section 1.05C] in the year 2000 was the result of some medical improvement in his impairments" since 1995, when he was found to meet such listing requirement).

"Because this is a case which requires a showing of changed circumstances (*i.e.*, medical improvement) in order to displace earlier findings, *Drummond v. Commissioner of Social Security*, 126 F.3d 837, 842 (6th Cir. 1997) (holding that 'when the Commissioner has made a final decision concerning a claimant's entitlement to benefits, the Commissioner is bound by this determination absent changed circumstances'), a comparison between circumstances existing at the time of the prior decision and circumstances existing at the time of the review is necessary. When the cessation of benefits is the issue, the Commissioner is not to make a new medical determination but rather is to determine whether there has been 'medical improvement,' (*i.e.*, a decrease in the severity of impairment). 20 C.F.R. § 416.994(b)(1)(i). The required comparison simply was not made in this case." *Kennedy v. Astrue*, 247 Fed. Appx. 761, 768, 2007 WL 2669153, *7 (6th Cir. 2007) (ALJ's conclusion that claimant's current functional abilities indicated medical improvement was not supported by substantial evidence).

In *Muncy v. Apfel*, 247 F.3d 728 (8th Cir. 2001), the plaintiff had been found entitled to disability insurance benefits in 1988 under Listing 12.05B (requiring a "valid verbal, performance, or full scale IQ of 59 or less") based on WAIS-R testing which showed his verbal IQ was 57, performance IQ was 64, and full scale IQ was 59, placing him in the mild range of retardation.  During a continuing disability review in 1994, however, another psychologist tested the plaintiff and found that on the WAIS-R, his verbal IQ was 84, performance IQ was 84, and full scale IQ was 84. An IQ of 84 placed him in the low normal range, described by "borderline intellectual functioning."  An ALJ determined that the new IQ score took the plaintiff outside the criteria of Listing 12.05B and concluded that he was no longer disabled.  The Eighth Circuit reversed and remanded for further proceedings because the ALJ failed to explain why the higher IQ score was used.  It stated:

An ALJ may disregard a claimant's IQ score when it is derived from a one-time examination by a non-treating psychologist, particularly if the score is inconsistent with the claimant's daily activities and behavior. *Clark v. Apfel*, 141 F.3d 1253, 1255-56 (8th Cir.1998). The Social Security regulations do not specify, however, which score the ALJ should disregard when there are differing scores from two apparently valid IQ tests. The issue here is whether the ALJ correctly disregarded the IQ score from a one-time examination by a non-treating psychologist apparently only because it is older–and significantly lower–than a later second score.

At least one court has suggested that the regulations require the ALJ to reach the opposite conclusion in this situation, rejecting the higher score. *See Ray v. Chater*, 934 F.Supp. 347, 350 (N.D.Cal.1996). In *Ray*, the claimant had two IQ scores: a 72 on a 1993 test and a 67 on a 1995 test. The ALJ relied on the higher score with the result the claimant could not qualify for benefits under section 12.05(D). The Social Security regulations provide, however, that when more than one IQ score is reached from the test administered, such as the verbal, performance, and full scale IQs obtained from the tests in the Weschler series that Dr. Stevens used in this case, the Commissioner must use "the lowest of these in conjunction with 12.05." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(D). The *Ray* court observed that this regulation might create an inference that "when multiple I.Q. scores are available [from IQ tests administered a different times,] the Regulations prefer the lowest score," 934 F.Supp. at 350, and remanded to the Commissioner for further development of the record with regard to the claimant's mental condition.

The ALJ here neither addressed the discrepancy between Muncy's two IQ scores nor discussed what factors called into question the first score's validity. Instead, the ALJ apparently accepted the validity of the second test over the first and attributed the twenty-five point increase in Muncy's IQ to "medical improvement." To discontinue a claimant's benefits because his or her medical condition has improved, the Commissioner must "demonstrate that the conditions which previously rendered the claimant disabled have ameliorated, and that the improvement in the physical condition is related to claimant's ability to

-16-

work." *Nelson v. Sullivan*, 946 F.2d 1314, 1315 (8th Cir.1991) (citing 20 C.F.R. § 404.1594(b)(2)-(5)).[8] Whether a claimant's condition has improved is primarily a question for the trier of fact, generally determined by assessing witnesses' credibility. *Id.* at 1316.

The regulations define mental retardation as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period" before age 22. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05. Mental retardation is not normally a condition that improves as an affected person ages. It is highly unlikely that an adult could gain twenty-five IQ points–a 42% increase–in six years.

Rather, a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning. *See, e.g., Branham v. Heckler*, 775 F.2d 1271, 1274 (4th Cir.1985) (absent contrary evidence, an IQ test taken after the insured period correctly reflects claimant's IQ during the insured period); *Guzman v. Bowen*, 801 F.2d 273, 275 (7th Cir.1986) (claimant had low IQ during onset of disability in 1979 rather than just when first IQ tested in 1982); *Luckey v. Department of Health & Human Servs.*, 890 F.2d 666, 668-69 (4th Cir.1989) (ALJ may assume claimant's IQ remained relatively constant in absence of evidence showing a change in claimant's intelligence functioning); *Holmes v. Apfel*, 1999 WL 731769, *5 (N.D.Ill.1999) (IQ score presumptively reflects person's IQ throughout life, no matter how old the person was when test first administered); *Ouellette v. Apfel*, 2000 WL 1771122, *3 (D.Me.2000) (absent contrary evidence, "a person's IQ and/or the condition of mental retardation is presumed to have been approximately constant throughout his/her life"). *See also Sird v. Chater*, 105 F.3d 401, 402 n. 4 (8th Cir.1997). The ALJ here cited no evidence demonstrating a dramatic upswing in Muncy's intellectual or adaptive functioning between 1988 and 1994, other than the higher second IQ score. Nor did the ALJ

---

[8] Section 404.1594 governs termination of Title II disability insurance benefits. The evaluation process is nearly identical to that provided in § 416.944 for termination of SSI benefits, although there is an additional step to determine whether the clamant is engaging in substantial gainful activity. *See* 20 C.F.R. § 404.1594(f).

challenge the validity of the first IQ score as inconsistent with other evidence in the record. Muncy remains unable to read, write, manage his finances, or even fill out Social Security applications. He thus still appears to be dependent on his wife for many activities of daily living.

We therefore must remand this matter to the Commissioner for further analysis to resolve the twenty-five point discrepancy between Muncy's two IQ scores. The Commissioner is directed to enter specific findings detailing why Muncy's first IQ score should not be adopted as the controlling score.

*Id.* at 733-35.

In the present case, the ALJ, while finding "reason to suspect that the IQ scores reported by Dr. Sedlacek in October 2000 [verbal, 67; performance, 69; full scale, 65]were not consistent with the Claimant's developmental history and degree of functional limitation" (Tr. 17), did not actually make a finding that the 2000 scores were invalid.  Nor did he make a finding that the IQ scores reported by Dr. Canell in 1990 (verbal, 58; performance, 70; full scale, 61), by the school district in 1991 (verbal, 68; performance, 75; full scale, 70), or by Dr. England in 2007 (verbal, 75; performance, 70; full scale, 72) were invalid.  All of these tests contain at least one IQ score within the parameters of Listing 12.05C (requiring IQ score of 60 through 70). Only the 1994 test administered by the school district resulted in IQ scores that all exceeded 70 (verbal, 72; performance, 77; full scale, 72). The ALJ cited Dr. England's 2007 test results as being inconsistent with Dr. Sedlack's 2000 test results, but even those 2007 test results included a performance IQ score of 70, which would meet Listing 12.05C's requirement.

The Commissioner states that "[t]he ALJ relied heavily on Dr. Stone's August 2005 examination findings in discounting the October 2000 IQ scores" (filing 24 at 3), but the ALJ did not explain how Dr. Stone's diagnosis of "mild mental retardation" (Tr. 364) conflicts with those IQ scores. Mild mental retardation is characterized by an IQ score of 50–55 to approximately 70. *See Diagnostic and Statistical Manual of*

-18-

*Mental Disorders* (*DSM–IV*), 40 (4th Ed. 1994).  The ALJ also discounted the 2000 IQ scores because Plaintiff "has performed unskilled work in the past" (Tr. 17), yet he later found that Plaintiff "has no history of relevant work activity."  (Tr. 20)

The ALJ appears to have relied upon Dr. Stone's opinions that Plaintiff has "only moderate restrictions in his activities of daily living, moderate limitations in his ability to maintain social functioning, and moderate limitations in his ability to maintain concentration, persistence and pace" (Tr. 17) to conclude that Plaintiff was not disabled as of September 1, 2005.  While those functional limitations would not meet the requirements of Listing 12.05D, they are irrelevant to Listing 12.05C. Similarly, the ALJ notes Dr. Stone's observations that Plaintiff is able "to care for himself, maintain social relationships, . . . [and] understand and remember short and simple instructions."  (Tr. 17) Those factors are relevant to Listing 12.05A (which does not depend on IQ scores), but not to Listing 12.05C.

"While a 'deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding, where the deficiency [has] no practical effect on the outcome of the case,' inaccuracies, incomplete analyses, and unresolved conflicts of evidence can serve as a basis to remand." *Draper v. Barnhart*, 425 F.3d 1127, 1130 (8th Cir.2005), quoting *Reeder v. Apfel*, 214 F.3d 984, 988 (8th Cir.2000). Remand is appropriate where the ALJ's factual findings, considered in light of the record as a whole, are insufficient to permit reviewing court to conclude that substantial evidence supports the ALJ's decision. *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 822 (8th Cir. 2008).

I am unable to conclude there is substantial evidence to support the ALJ's finding that Plaintiff's impairments do not satisfy the requirements of Listing 12.05C for mild mental retardation.  Moreover, even if there were substantial evidence to support this "step one" finding, the ALJ did not make a proper "step two" finding of medical improvement.  Because the ALJ's decision does not follow the evaluation procedure described in 20 C.F.R. § 416.994(b)(5), and is lacking in substance, the decision must be reversed and the case remanded for further proceedings.

-19-

### III.  Conclusion

For the reasons discussed above, I will reverse the Commissioner's decision and remand the case for redetermination of Plaintiff's entitlement to SSI benefits from and after September 1, 2005.  If on remand it is again found that Plaintiff's impairments did not meet or equal a listing as of September 1, 2005, the ALJ must fully explain the factual basis for this finding and then must also make a finding of whether there was medical improvement since 2000. If, after proceeding through the seven-step evaluation process, the ALJ ultimately decides that Plaintiff's disability ended on September 1, 2005, he should then consider, as specified in the Commissioner's motion to remand, whether Plaintiff became entitled to benefits at a later date.

IT IS ORDERED that:

1.      The Commissioner's motion to remand (filing 21) is denied.

2.      Judgment shall be entered by separate document, providing that the decision of the Commissioner is reversed and the cause remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

August 23, 2011.                         BY THE COURT:

                                         *Richard G. Kopf*
                                         United States District Judge

_____

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.

-20-